## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## CENTRAL DIVISION

|  |  |
|---|---|
| In re: ) | Chapter 11 |
| ) | Case No. 10-41302-MSH |
| NA-MOR, Inc. ) |  |
| ) |  |
| Debtor. ) |  |
| ) |  |

### MEMORANDUM OF DECISION ON DEBTOR'S MOTION TO SELL

This matter came before me on the motion [# 32] of the Debtor, Na-Mor, Inc., a Massachusetts corporation, ("Namor-Mass" or the "Debtor") to sell its interest in certain real property located in Harwinton, Connecticut, free and clear of all liens, pursuant to 11 U.S.C § 363(b) and (f)(4). Creditor Banco Popular North America [#39] and interested party Robert Armistead [# 48] objected to the proposed sale arguing that the Debtor's interest in the property was assigned to another party nearly twenty years ago, so the property is not property of the bankruptcy estate. For the reasons set forth below, I have concluded that the factual record before me is insufficient for a determination as to whether the Harwinton property is property of the bankruptcy estate and that further proceedings are required.

### Facts Currently on the Record

The Debtor was incorporated in Massachusetts as Na-Mor, Inc. in 1981 with Cynthia Dziurgot as its president, treasurer, sole director and sole shareholder. Later that year Ms. Dziurgot formed another corporation, CD Holdings of Delaware, Ltd., as a Delaware corporation, again with herself as sole shareholder. In February 1982, Ms. Dziurgot transferred her shares of Namor-Mass to CD Holdings, thereby making Namor-Mass a wholly-owned subsidiary of CD Holdings. On June 3, 1986, Dziurgot purchased the Harwinton property and on September 10,

1

1987 conveyed it to Namor-Mass. On the same day, Namor-Mass conveyed the property to third parties and took back a purchase money mortgage to secure a portion of the purchase price. According to Mr. Armistead, Namor-Mass began foreclosure proceedings with respect to its mortgage on the property in 1989. Memorandum of Law [# 58] of Robert Armistead at 1.

On December 31, 1990, the Secretary of the Commonwealth of Massachusetts administratively dissolved Namor-Mass for failure to meet its annual reporting requirements. Shortly thereafter, on February 13, 1991, Na-Mor, Inc., a Delaware corporation ("Namor-Delaware") was formed as another wholly-owned subsidiary of CD Holdings.

On February 13, 1991, CD Holdings and Namor-Delaware entered into an Agreement (the "Transfer Agreement"), which recites that CD Holdings, as sole shareholder of Namor-Mass, received all of the assets and liabilities of Namor-Mass "at the time of its dissolution on or about December 31, 1990." Aff. of Robert Armistead [# 60] in support of his [# 48] Objection to the Debtor's Motion to Sell ("Armistead Aff."), Ex. C. Through the Transfer Agreement, CD Holdings purported to "assign[], transfer[] and convey[], all of its rights title and interest to all of the assets and liabilities it received from [Namor-Mass] at the time of its dissolution to [Namor-Delaware]." Following this purported transfer, on June 13, 1991 an entity named "Na-Mor, Inc." with no indication of state of incorporation, recorded in the Harwinton, Connecticut Land Records a certificate of foreclosure with respect to the property. Armistead Aff., Ex. D. According to said Land Records, in 1992 and 2004, Na-Mor, Inc., again with no indication of state of incorporation, mortgaged the property to the National Back of Litchfield and in 2008, an

2

entity identified as "Na-Mor, Inc., a Connecticut corporation," mortgaged the property to Banco Popular.[1]

On November 9, 2009, Ms. Dziurgot filed an application to revive Namor-Mass as a corporation for the purpose of conveying title to real property owned by the corporation. Debtor's Supplemental Memorandum [# 62] ("Supp. Mem."), Ex. A. Namor-Mass was subsequently revived as a corporation on November 12, 2009 "for a period of time not to exceed **one year,** for the purpose of **conveying title to real property owned by the corporation,** but not for the purpose for which it was organized." Sup. Mem, Ex. B (emphasis in original). Namor-Mass commenced this Chapter 11 case on March 22, 2010 ostensibly in furtherance of this limited purpose.

## Discussion and Conclusion

In order to determine whether the Harwinton property is property of the Namor-Mass bankruptcy estate, one must determine first whether the assets of Namor-Mass were ever transferred after its dissolution, and second, what assets, if any, Namor-Mass owned upon its revival.

Namor-Mass' dissolution in 1990 and its revival in 2009 were each governed by the Massachusetts Business Corporations Law ("BCL"), Mass. Gen. Laws ch. 156B.[2]

---

[1] It would appear that there never was a Connecticut corporation called Na-Mor, Inc. Subsequent to the loan transaction Banco Popular was notified to correct its records to reflect that Namor-Delaware was its borrower. Armistead Aff. Exs. I and J.

[2] The BCL was superseded by the Massachusetts Business Corporations Act ("MBCA"), Mass. Gen. Laws ch. 156D with respect to all business corporations as of July 4, 2004. Mass. Gen. Laws ch. 156D, § 17.01. Nevertheless, because Namor-Mass was dissolved pursuant to the BCL, and because the BCL provision on revival (Mass. Gen. Laws ch. 156B, § 108) relates back to the time of the dissolution, see discussion infra, Namor-Mass was revived pursuant to the BCL, even though the revival was after the effective date of the MBCA. See Revival Certificate, Sup. Mem. Ex. B.

The BCL provides for three kinds of dissolution: judicial dissolution (Mass. Gen. Laws ch. 156B, § 99), voluntary dissolution (Mass. Gen. Laws ch.156B, § 100), and administrative dissolution (Mass. Gen. Laws ch. 156B, § 101). It is apparent that the dissolution in the present case was administrative, because it was performed by the Secretary of the Commonwealth due to Namor-Mass' failure to file annual reports. Supp. Mem. Ex. B. The procedure for administrative dissolution is contained in Mass. Gen. Laws ch. 156B, § 101, which provides for a written notice informing the corporation's registered agent of the impending dissolution and cause therefor, and allows the corporation ninety days to correct or contest the asserted reasons for dissolution. After the ninety-day period, the Secretary of the Commonwealth may dissolve the corporation.

The BCL further provides that a dissolved corporation continues to exist for a three-year period following its dissolution for certain limited purposes including settling and closing its affairs, conveying property and making "distributions to its stockholders of any assets remaining after the payment of its debts and obligations." Mass. Gen. Laws ch. 156B, § 102; see also Barker-Chadsley Co. v. W.C. Fuller Co., 448 N.E.2d 1283, 1285 (Mass. App. Ct. 1983) (clarifying the limited purposes for which "some dormant germ" of the corporation remained extant for the period following its dissolution).

All parties to this dispute accept as self-evident the proposition that immediately upon its dissolution on December 31, 1990, all the assets of Namor-Mass became the property of its sole shareholder, CD Holdings. A review of applicable Massachusetts law, however, reveals this to be a false premise.

4

The law in Massachusetts for corporations dissolved under the BCL is clear; a corporation's assets do not pass to shareholders immediately upon dissolution but only after the three year statutory wind-up period.   In <u>Pagounis v. Pendleton</u>, 753 N.E.2d 808 (Mass. App. Ct. 2001), a litigant argued that he had standing to prosecute the claims of a dissolved corporation prior to the expiration of the wind-up period because he, as a shareholder, succeeded to the corporation's claims immediately upon dissolution.   The Appeals Court rejected this argument, stating that "the authorities clearly demonstrate that the doctrine [of assets passing to shareholders upon dissolution] is inapplicable during [the wind-up] period."   <u>Id.</u> at  813.   The <u>Pagounis</u> court relied on <u>Cummington Realty Associates v. Whitten</u>, 239 Mass. 313, 325 (1921).   See also <u>Everett Credit Union v. Allied Ambulance Services, Inc.,</u> 424 N.E.2d 1142, 1146 (Mass. App. Ct. 1981); <u>City of Springfield v. Schaffer</u>, 423 N.E.2d 797, 799 (Mass. App. Ct. 1981) ("Because more than three years had elapsed from the date of the dissolution of [the subject corporation], the respondent became the owner of all of that corporation's real property by reason of being the corporation's sole shareholder upon dissolution."); <u>Halliwell Associates, Inc. v. C.E. Maguire Services, Inc.</u>, 586 A.2d 530, 534 (R.I. 1991) (courts have long recognized that after the statutory wind-up period expires, former shareholders of a dissolved corporation have the right "to succeed, in their individual capacities, to assets owned by the corporation prior to its dissolution.").

Based on the facts thus far adduced, Namor-Mass held the mortgage on the Harwinton property on the date of its dissolution.   Therefore, under the BCL, which was in effect at that time, Namor-Mass retained ownership of the mortgage, as well as any other of its assets, until the earlier of the sale of such assets by Namor-Mass, or December 31, 1993, when the statutory wind-up period ended and title to any remaining assets passed to CD Holdings, Namor-Mass' sole

5

shareholder. The upshot of all this is that the Transfer Agreement purporting to transfer the assets of Namor-Mass from CD Holdings to Namor-Delaware in 1991 was ineffective. The language of the Transfer Agreement is perfectly clear in that its stated purpose was to transfer all of the assets and liabilities that CD Holdings "received from [Namor-Mass] at the time of its dissolution." As no assets or liabilities were received by CD Holdings at that time, the Transfer Agreement did not transfer anything.

Since the Transfer Agreement was ineffective, Namor-Mass' assets remained in place unless they were disposed of by Namor-Mass during its wind-up period which ended on December 31, 1993. There is nothing currently in the record to indicate that any such transfers occurred and therefore, under Massachusetts law, Namor-Mass' assets became the assets of CD Holdings, Namor-Mass' sole shareholder, as of December 31, 1993.

There is likewise nothing in the record to indicate that CD Holdings acted in any way with respect to the assets of Namor-Mass it acquired at the end of the wind-up period. On the contrary, it appears that CD Holdings believed (incorrectly) that it had transferred all of Namor-Mass' assets <u>during</u> the wind-up period by way of the Transfer Agreement.

If no transfers by CD Holdings occurred from the time it acquired Namor-Mass' assets until Namor-Mass was revived, as the evidence before me suggests, I must look to the BCL to determine the effect of revival on the title to those assets. Under the BCL, a corporation can be revived[3] at any time following its dissolution, Mass. Gen. Laws ch. 156B, § 108, and the Secretary

---

[3] The terms "reinstatement" and "revival" appear to be used interchangeably in Massachusetts. <u>Compare</u> Mass. Gen. Laws 156D, § 14.22(a) ("A corporation administratively dissolved under section 14.21 may apply to the secretary of state for reinstatement at any time.") <u>with</u> Revival Certificate, Supp. Mem., Ex. C ("I hereby declare that said corporation is revived . . . ."). Other jurisdictions attach different meanings to the two terms. <u>See, e.g.</u>, <u>Redl v. Secretary of State</u>, 120

of the Commonwealth may condition revival on such terms and conditions as the public interest requires.  Id.  If the Secretary files a certificate of revival, the revival relates back to the time of the corporation's dissolution, and the corporation

> shall stand revived with the same powers, duties and obligations as if it had not been dissolved, except as otherwise provided in said certificate; and all acts and proceedings of its officers, directors and stockholders, acting or purporting to act as such, which would have been legal and valid but for such dissolution, shall, except as aforesaid, stand ratified and confirmed.

Id.

Thus the revival of a corporation has the effect of automatically transferring its former assets from its shareholders back to the corporation.   Without this effect, the revival would merely restore the corporate entity as an empty shell, a result not consonant with the language of § 108 of the BCL which contemplates revival of the corporation "as if it had not been dissolved."  Clearly, if the shareholders of a dissolved corporation had sold former corporate assets after the wind-up period but before the revival, the statute would automatically ratify such a sale upon the corporation's revival.  If, however, no action had been taken by the shareholders with respect to the assets, then simple logic would dictate that the revival must have the effect of returning those assets to the corporation.

This interpretation of § 108 of the BCL is supported by case law.  Courts have held that the rights and obligations of a dissolved corporation that were automatically transferred to its shareholders at the end of the statutory wind-up period were restored to the corporation upon its revival, effective as of the end of the wind-up period.  See Stock Pot Restaurant, Inc. v. Stockpot, Inc., 737 F.2d 1576 (Fed. Cir. 1984) (holding that a revived corporation may continue to use its

---

P.3d 797, 799-800 (Nev. 2004) (comparing reinstatement and revival under Nevada law).

pre-dissolution trademark); <u>Devlin Cons. Corp. v. Driftway South Const. Corp</u>, 14 Mass. App. Ct. 954 (1982) (permitting a revived corporation to maintain an action retroactively to the end of its wind-up period).

Under this analysis, if CD Holdings had sold any of the former assets of Namor-Mass after the end of the wind-up period, such sales would have been automatically ratified by Namor-Mass upon its revival. On the other hand, if CD Holdings had not sold the assets it acquired after the expiration of the wind-up period, then those assets would have reverted to the Debtor, Namor-Mass, upon its revival, and would now be property of the estate. This issue is greatly complicated, however, by the fact that on the date if its dissolution Namor-Mass owned the mortgage on the Harwinton property but the mortgage was foreclosed *during* the wind-up period. The certificate of foreclosure does not specify which Na-Mor, Inc. took title to the Harwinton property as a result of the foreclosure, Namor-Mass or Namor-Delaware. If Namor-Mass was in fact the entity that foreclosed and took title to the property (which was certainly consistent with Namor-Mass' authority to wind up its affairs under BCL § 102), and the property was never subsequently transferred by Namor-Mass then at the expiration of the 3-year wind-up period on December 31, 1993, CD holdings automatically acquired title to the property. CD Holdings engaged in no transfer of the property between December 31, 1993 and November 12, 2009 and thus under this set of facts title to the property reverted to Namor-Mass immediately upon its revival on November 1, 2009, and continues to be owned by Namor-Mass today. If, however, Namor-Delaware was the foreclosing entity then two alternate outcomes are possible. If Namor-Delaware had legal authority to foreclose (which authority would have had to derive from something other than the Transfer Agreement) then Namor-Delaware became, and continues to be,

8

the owner of the Harwinton property and the Debtor has nothing to sell.  If, on the other hand, Namor-Delaware lacked authority to foreclosure, then the foreclosure was invalid and title to the Harwinton property may remain with the original mortgagors, while Namor-Mass remains the mortgagee.

The record in this case does not identify with sufficient clarity the party who commenced and prosecuted the Connecticut foreclosure proceeding or who is named in the foreclosure certificate.  A determination as to whether the foreclosure was valid, and if it was, who took title to the property will require additional evidence without which I cannot determine if the Debtor owns the property it seeks to sell.  A contested matter pre-hearing order shall issue establishing discovery and other deadlines and setting this matter down for further hearings.

Dated:   September 28, 2010                                                          By the Court,

                                                                                   Melvin S. Hoffman
                                                                                   U.S. Bankruptcy Judge